**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

WILDEARTH GUARDIANS,

    Plaintiff,

v.

NATIONAL PARK SERVICE,

    Defendant.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**I.   INTRODUCTION**

    1.   Plaintiff, WildEarth Guardians, challenges the failure of Defendant, National Park Service ("Park Service"): (1) to consider reintroducing gray wolves (*Canis lupus*) into Rocky Mountain National Park ("RMNP") as a reasonable alternative for elk and vegetation management under the National Environmental Policy Act ("NEPA") (42 U.S.C. § 4371); (2) to prohibit hunting in RMNP under the National Park Service Organic Act ("Organic Act") (16 U.S.C. §§ 1, 1a-1) and the Rocky Mountain National Park Act ("RMNP Act") (16 U.S.C. § 198c); and (3) to carry out programs to conserve the gray wolf as an endangered species in RMNP under section 7(a)(1) of the Endangered Species Act ("ESA") (16 U.S.C. § 1536(a)(1)).

2.      In developing its RMNP elk management plan, the Park Service ignored certain alternative approaches and instead adopted an approach that amounts to ecological over-management. Elk overgraze when they lack a coursing predator to keep them wary and moving. The Park Service admits this, finding the elk herd's population size, density, and behavior is unnatural due to the absence of predators. Additionally, the Park Service admits the endangered gray wolf is critical to reestablishing natural conditions in RMNP. Yet, the Park Service failed to consider reintroducing a natural wolf population as an alternative in its elk management plan and in doing so violated NEPA and its implementing regulations. The decision to use snipers to hunt elk within RMNP is a violation of the RMNP Act's express prohibition on hunting within RMNP. Furthermore, the Park Service has a duty to conserve endangered species and could have used the elk management problem as an opportunity to carry out programs to conserve the federally endangered gray wolf in RMNP. The Park Service is violating the ESA by failing to carry out conservation programs for the gray wolf. Declaratory and injunctive relief is required to remedy these violations of federal law and to restore the natural conditions within RMNP.

## II.     **JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. §§ 1540(c), (g) (ESA's citizen suit provision), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). This Court may grant the relief requested under 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. § 701-706 (Administrative Procedure Act). As required by 16 U.S.C. § 1540(g)(2), Plaintiff furnished Defendants with written notice of their violations of the ESA and Plaintiff's intent to sue more than 60 days ago. Defendants

have neither responded nor changed their position. Therefore, an actual controversy currently exists between the parties.

4. Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e). RMNP, the subject of this action, is located in this district.

## III.  PARTIES

5. Plaintiff WILDEARTH GUARDIANS sues on behalf of itself and its adversely affected members. WildEarth Guardians is a new non-profit environmental organization created on January 28, 2007, by the merger of three organizations: Forest Guardians, Sinapu, and Sagebrush Sea Campaign. WildEarth Guardians has over 4,500 members, many of whom reside in the District of Colorado. Forest Guardians and Sinapu, predecessors in interest of WildEarth Guardians, filed timely formal comments to the Draft Environmental Impact Statement for the Elk and Vegetation Management Plan at issue in this case. Sinapu and Forest Guardians also provided the Park Service with written notice of their intent to sue over the Park Service's violations of the ESA. WildEarth Guardians continues these efforts of Forest Guardians and Sinapu. WildEarth Guardians is committed to protecting and restoring wildlife (including wolves), wild rivers, and wild places in the American West. WildEarth Guardians' members frequently visit RMNP to observe elk and other wildlife. WildEarth Guardians' members would like to have wolves returned to RMNP so they could observe wolves more often. WildEarth Guardians' members have concrete future plans to return to RMNP to view wildlife. WildEarth Guardians has repeatedly urged the Park Service to both fully evaluate the reintroduction of a natural wolf population into RMNP as a method to control the park's elk population and to carry out programs to conserve the gray wolf within RMNP. WildEarth Guardians has an active

3

carnivore recovery program. The carnivore recovery program focuses on protecting carnivores and restoring them to their natural habitats. Defendant Park Service's failure to consider reintroducing a natural gray wolf population as a reasonable alternative, to prohibit hunting in RMNP, and to carry out programs for the conservation of gray wolves in RMNP has adversely affected and continues to adversely affect and irreparably harm, WildEarth Guardians' and its members' interest in gray wolves. This failure leaves gray wolves unprotected and facilitates the species' decline. The relief sought would redress WildEarth Guardians' injuries.

6.      Defendant, NATIONAL PARK SERVICE is sued in its official capacity as administrator of the Park. The Defendant is responsible for management actions taken in RMNP.

## IV.     LEGAL BACKGROUND

### A.     NEPA

7.      NEPA is our nation's basic charter for the protection of the environment. NEPA contains action-forcing provisions, ensuring federal agency compliance with the spirit of the law. 40 C.F.R. § 1500.1. NEPA has two purposes. First, NEPA mandates that federal agencies evaluate or take a "hard look" at the environmental consequences of their actions *before* acting. 42 U.S.C. § 4331. Second, NEPA provides a mechanism for the public to learn and comment on the environmental impacts of proposed agency actions. To comply with NEPA, federal agencies must prepare and publish a detailed environmental impact statement ("EIS") for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). An EIS must evaluate and disclose the impacts of a proposed action, consider action alternatives and their impacts, and identify all irreversible and irretrievable commitments of resources

required by the considered actions. *Id.* To assure the incorporation of all available scientific expertise, agencies must "to the fullest extent possible… [e]ncourage and facilitate public involvement" in decision-making. *Id.* § 1500.2(d). NEPA "ensures that the agency will inform the public that it has indeed considered all environmental concerns," and allows for scientific experts outside of the agency to have input in the decision-making process. 40 C.F.R. § 1500.1.

8.  NEPA requires agencies to examine a range of reasonable alternatives to proposed actions. This analysis is the "heart" or "linchpin" of an EIS. 40 C.F.R. § 1502.14. When preparing an EIS, a federal agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action and give each alternative <u>substantial treatment</u>. 42 U.S.C. § 4332(2)(c)(iii), (2)(E); 40 C.F.R. § 1502.14(a). <u>The presence of a viable but unexamined alternative renders an EIS inadequate.</u> Here, the Park Service failed to examine reintroducing a natural population of gray wolves into the Park.

**B.   ESA**

9.  The purpose of the ESA is to conserve endangered and threatened species and the ecosystems upon which these species depend. 16 U.S.C. § 1531(b). When drafting the ESA, Congress plainly intended that agencies prioritize endangered species conservation before other agency actions.

10. ESA section 2 defines "conserve" as "to use[,] and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). Specifically, section 7 of the ESA mandates that agencies facilitate species protection when acting or making decisions. 16 U.S.C. § 1536. Federal agencies "shall . . . utilize their

5

authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species." 16 U.S.C. § 1536(a)(1).  Thus, agencies have an affirmative duty under section 7(a)(1) to conserve endangered and threatened species. *Id.*  This duty is both mandatory and substantive. *Id.*

### C.     Organic Act and RMNP Act

11.     The Organic Act requires the Park Service to manage its lands for one "fundamental purpose…to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such a manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1. The Organic Act also forbids the Park Service from allowing any activity that will cause "derogation of the values and purposes for which [the area has] been established."  16 U.S.C. § 1a-1.  Under this section, the Park Service "is to afford the highest standard of protection and care to the natural resources within…the National Park System."  S. Rep. No.95-528, at 14 (1977).

12.     In the Organic Act, Congress prohibited hunting in national parks unless expressly granted by a park's unique enabling language.  16 U.S.C. § 1.  Although the Secretary has discretion when deciding how to affect conservation within national parks, the Secretary cannot authorize activities in direct contradiction to the purposes of the Act.  *Id.*  This discretionary power includes the ability to destroy animal and plant life that is detrimental to the use of national parks.  16 U.S.C. § 3.  However, the Organic Act must be read as a whole and in light of each national park's unique enabling language.  16 U.S.C. § 1a-1.  Thus, if the Organic Act conflicts with an individual park's enabling act, <u>the park's enabling act governs</u>.

6

13.     The RMNP Act expressly prohibits "<u>all hunting</u>, killing, wounding, or capturing <u>at any time</u> of any wild bird or animal . . . ." 16 U.S.C. § 198c (emphasis added).

## V.     FACTUAL BACKGROUND

### A.     Gray Wolf

14.     Gray wolves are endemic to North America and specifically Colorado. Historically, the species numbered in the hundreds of thousands and ranged from Alaska to Mexico and from the Pacific to the Atlantic coasts. However, government-sponsored predator control programs greatly reduced gray wolf populations in the early part of the twentieth century. This mass extermination brought the species close to extinction in lower 48 United States, resulting in the gray wolf's listing as an endangered species in 1973.

15.     Gray wolves are crucial to the natural balance in RMNP and in any habitat in which they once lived. Gray wolves live in highly ordered wolf packs, comprising basic family groups. Often, wolf packs comprise of 5-8 individuals. Gray wolves prey on elk and other animals. Wolf-kills provide food for scavengers such as ravens, bald eagles, and foxes.

16.     Recently, scientists have found evidence of wolves in Colorado. In 2004, a vehicle killed a radio-collared female wolf from Yellowstone National Park ("Yellowstone"), along I-70, thirty miles west of Denver. In February 2006, Colorado Division of Wildlife district wildlife managers captured video of what biologists believe to be a wolf traveling along the Colorado-Wyoming border. In December 2007, volunteers in RMNP spotted a large black wolf-like canine in RMNP. Most recently, in January 2008, biologists identified a footprint found in RMNP as that of a possible wolf or wolf hybrid. Thus, the evidence shows that individual wolves are making their way back into Colorado.

### B.   Rocky Mountain National Park

17.   Elk are overgrazing native plants in RMNP's wetland areas. Wetland vegetation supports a wide range of species, including birds, butterflies, and beavers. Healthy wetland areas are crucial to maintaining the natural balance in RMNP. Both the Park Service and the scientific community believe that the absence of gray wolves causes overgrazing. Gray wolves prey on elk, causing elk herds to disperse. The Park Service admits that under natural conditions, wolves play a key role in regulating the elk herd size and distribution.

18.   Elk congregate in wetland areas to forage. Wolves also inhabit wetland areas. Evidence from Yellowstone establishes that elk spend less time foraging in wetland areas when wolves are present in the ecosystem, thereby naturally reducing grazing in wetlands. From 1923 to 1968 in Yellowstone, the Park Service attempted artificial management of elk. Management techniques included Park Service removal and hunting outside of Yellowstone. Human-techniques failed to significantly increase plant regeneration or prevent overgrazing. However, once the United States Fish and Wildlife Service ("FWS") and the Park Service reintroduced wolves, the elk stopped overgrazing and plant populations regenerated.

### C.   RMNP Elk and Vegetation Management Plan

19.   The Park Service is attempting to repair RMNP's elk-damaged wetlands by controlling the elk population with artificial means—specifically birth control and hunting. Initially, the Park Service proposed five (5) action alternatives in its EIS. Theoretically, each alternative would provide a reasonable remedy to solve the problems of overgrazing and elk density in the Park. The alternatives included no action (i.e., continuation with the current management plan); immediate lethal removal executed by government employees or private

contractors; gradual lethal removal over a 20-year period, executed by government or private contractors, coupled with installation of fences around riparian flora and elk distribution and other dispersal techniques; elk fertility control coupled with gradual lethal removal executed by government or private contractors; and lethal reduction of elk combined with the release of <u>sterile</u> gray wolves.

20. The Park Service chose the elk fertility control coupled with lethal removal alternative. This alternative uses trained snipers to hunt elk over a 20-year period. In addition, the chosen alternative uses fencing of sensitive aspen and willow stands, redistribution of elk with adverse conditioning and herding, and vegetation restoration. Adverse conditioning and herding will include the use of herding dogs, people on foot, horseback riders, sticks and streamers, rubber bullets, cracker shots, and possibly helicopters. The Park Service may later reconsider using fertility control after the logistics and effectiveness of fertility control drugs are improved.

21. Notably absent from the EIS was the reintroduction of a natural population of gray wolves.

## FIRST CLAIM FOR RELIEF

**(The Park Service violated NEPA by failing to consider the reintroduction of a natural and self-regulating population of wolves as a reasonable or viable alternative)**

20. Paragraphs 1- 21 are incorporated herein by reference.

21. The Park Service's FEIS and ROD for the Rocky Mountain National Park Elk Management Plan is a final agency action.

22. The Park Service's failure to consider reintroduction of a natural population of gray wolves as a reasonable action alternative violates NEPA and its implementing regulations. 42 U.S.C. § 4321; 40 C.F.R. § 1500.1.

23. The Park Service's failure to take a hard look at the reintroduction of reproducing wolves is arbitrary, capricious, and not in accordance with law as required by section 706(2) of the APA, and is subject to judicial review. 5 U.S.C. §§ 701-706.

## SECOND CLAIM FOR RELIEF

**(The Park Service violated the Organic Act and the RMNP Act by failing to prohibit hunting in RMNP.)**

24. Paragraphs 1-21 are incorporated herein by reference.

25. The Park Service's selected action alternative involves the "controlled culling" of elk populations. "Controlled culling" is hunting.

26. Hunting is <u>expressly prohibited</u> in RMNP. 16 U.S.C. § 198c.

27. Failure to prohibit hunting in RMNP violates the RMNP Act. *Id.* This violation is actionable under the APA. 5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF

**(The Park Service violated the ESA by failing to carry out programs for the conservation of gray wolves in RMNP.)**

28. Paragraphs 1-21 are incorporated herein by reference.

29. The gray wolf is an endangered species. 50 C.F.R. 17.11(h).

30. Section 7(a)(1) mandates that "all federal agencies shall . . . utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1).

31.     The Park Service must conserve the gray wolf. 16 U.S.C. § 1531(c)(1); 16 U.S.C. § 1536(a)(1).

32.     The Park Service violated section 7(a)(1) by failing to "carry out programs for the conservation" of the gray wolf, an endangered species. 16 U.S.C. § 1536(a)(1). This violation is actionable under the citizen suit provision of the ESA and section 706 of the APA. 16 U.S.C. § 1540(g)(1)(C); 5 U.S.C. § 706.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declaratory judgment that the Park Service's failure to consider reintroduction of a natural population of wolves as a reasonable alternative is a violation of NEPA;

2.      Declaratory judgment that the Park Service's violations of NEPA render the DEIS and FEIS for the Plan legally inadequate;

3.      Injunctive relief compelling the Park Service to take a "hard look" at the action alternative of reintroducing natural gray wolves into the Park;

4.      Declaratory judgment that the Park Service's failure to prohibit hunting within the Park boundaries is in violation of the Organic Act and the RMNP Act;

5.      Injunctive relief enjoining the Park Service from hunting elk;

6.      Declaratory judgment that "controlled culling" is hunting;

7.      Declaratory judgment that the Park Service is in violation of its non-discretionary duty under the ESA to carry out programs for the conservation of gray wolves in the Park and greater Colorado;

    8.    Injunctive relief compelling Park Service to comply with the conservation mandate of ESA section 7(a)(1);

    9.    An order awarding Plaintiff their costs of litigation, including reasonable attorneys' fees available under the ESA (16 U.S.C. § 1540(g)(1)(C)) and the Equal Access to Justice Act (5 U.S.C. § 504; 28 U.S.C. § 2412);

    10.    Any such other relief as the Court deems just and proper.

Respectfully submitted this 25th day of March, 2008.

/s/Brianna K. Bond
Brianna K. Bond (CO Bar No.38739)
Environmental Law Clinic
Student Law Office
University of Denver College of Law
2255 E. Evans Ave.
Denver, Colorado 80208
Ph: 303-871-6140
Fax: 303-871-6847
E-Mail: kbond@law.du.edu

James J. Tutchton
Environmental Law Clinic
Student Law Office
University of Denver College of Law
2255 E. Evans Ave.
Denver, Colorado 80208
Ph: 303-871-6140
Fax: 303-871-6847
E-Mail: jtutchton@law.du.edu

Attorneys for Plaintiff WildEarth Guardians