**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 08-cv-00608-MSK-CBS

WILDEARTH GUARDIANS,

      Plaintiff,

v.

NATIONAL PARK SERVICE,

      Defendant.

---

**MEMORANDUM OF AMICUS THE HUMANE SOCIETY OF THE UNITED
STATES IN SUPPORT OF PLAINTIFF'S PETITION FOR REVIEW OF
AGENCY ACTION ALLOWING USE OF VOLUNTEER HUNTERS IN
ROCKY MOUNTAIN NATIONAL PARK**

---

## Introduction

The Humane Society of the United States ("The HSUS") submits this

memorandum in support of Plaintiff WildEarth Guardians' claim that the National

Park Service's ("NPS") decision to allow volunteer members of the public to kill elk

in the Rocky Mountain National Park ("RMNP" or "the Park") is unlawful under the

National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1 *et seq*., the Rocky

Mountain National Park Act ("Enabling Act" or "RMNP Act"), 16 U.S.C. § 191 *et

seq*., and is in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §

706(2)(A).  In addition, and also in violation of the APA, the NPS's decision to

permit public volunteers to kill elk in the Park contravenes the Volunteers in the

Parks Act ("VIP Act"), 16 U.S.C. § 18g *et seq*., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.

The NPS's decision to allow public volunteers to directly participate in the lethal reduction of elk in the Park has significant safety, efficiency and other park management implications that the agency has identified during the planning process but entirely failed to address in its eleventh-hour effort to provide recreational opportunities to local hunters. Moreover, the NPS's decision represents a significant change in precedent with far-reaching policy implications that affect many stakeholders, not only at the RMNP, but throughout the entire Park System.

The NPS has determined that it is necessary to manage the elk herd in the RMNP to reduce negative impacts on vegetation, particularly aspen and montane riparian willow. Record of Decision p. 2-3 ("ROD"). On May 29, 2003, the NPS published a notice of intent to prepare an Environmental Impact Statement ("EIS") pursuant to NEPA, 42 U.S.C. § 4332(C). 68 Fed. Reg. 32,084-86 (May 29, 2003). After conducting scoping and analyzing a range of alternatives, the NPS published a Draft EIS on April 20, 2006. 71 Fed. Reg. 20,414-15 (April 20, 2006).

The Draft EIS analyzed five alternatives in detail, *none of which* would have authorized volunteer members of the public to enter the park and engage in the lethal reduction of the elk herd. *See* Draft EIS p. i (AR 18509). Under the Draft EIS, the NPS's preferred Alternative 2 set forth a plan to reduce the elk population "to a low population target (1,200 to 1,700 elk) using lethal means implemented by *NPS staff or contractors*." *Id*. at 56 (AR 18606) (emphasis added). Indeed, the only

mention of the use of public volunteers to kill elk was presented in an alternative *summarily rejected as unlawful*, and among those management options not selected for study or discussion in further detail. *See Id.* at 75-77 (AR 18625-27). The Draft EIS states:

> Two alternatives were considered that would allow the public to be involved in management actions inside the park to directly reduce elk population. One type of hunt involved opening areas of the park on the winter range to hunting using a lottery system, referred to as a lottery hunt in this section. The second type of hunt would have relied on members of the public who qualified as marksmen to reduce the elk population through lethal reductions under strict guidance and direction of NPS staff. *An alternative that involved public hunting to manage elk inside the park was not carried forward for further analysis because it would be inconsistent with existing regulatory authority regarding public hunts in national parks and with longstanding basic policy objectives for NPS units.*

*Id.* at 75 (AR 18625) (emphasis added).

After a comment period and further revision to the Draft EIS, the NPS published the Final EIS on December 11, 2007. 72 Fed. Reg. 70,342 (Dec. 11, 2007). Despite the Draft EIS's *explicit rejection* of any alternative that would have allowed members of the public to enter the park and shoot or kill elk, the Final EIS's selected alternative – Alternative 3 – suddenly shifted course and, without discussion, announced that lethal reduction activities may be carried out by "NPS personnel and their authorized agents." Final EIS at 68 (AR 20935). The Final EIS then went on to define "authorized agents" as "professional staff from other federal, state, or local agencies or tribes; contractors; or *qualified volunteers*." *Id.* at H-1 (AR 21498) (emphasis added).

As discussed more fully below, the NPS's decision to allow public volunteers to assist in the lethal reduction of the elk herd in the RMNP is indistinguishable from the public hunting activities that the Service rejected in its Draft EIS as unlawful.  Providing public volunteers with the opportunity to enter the Park to shoot and kill elk is clearly unlawful under the Organic Act, the Service's own regulations, the RMNP Act, and the VIP Act.  Simply recasting these public hunters as "volunteers" does nothing to remedy the unlawful nature of the arrangement.

The NPS also violated NEPA both by failing to produce a supplemental EIS and by thwarting meaningful public comment with respect to its decision to allow public volunteers to kill elk in the Park, since this alternative was first presented to the public in the Final EIS after being expressly rejected in the Draft EIS circulated for public review.

The NPS further failed to provide any rational explanation for why it suddenly authorized public killing of wildlife after banning it for seven decades in this case, which represents a significant departure from longstanding agency precedent. In rejecting the use of public volunteer hunters in the Draft EIS, the agency stated that this activity was not only unlawful, but would raise safety concerns, be less efficient than if Park Service agents lethally reduced the elk herd, and cause negative effects on Park visitor experience.  Yet, the agency failed entirely to address these issues when it suddenly reversed course in the Final EIS. The failure of the agency to provide any rationale for its abrupt change of course is

arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).

**Argument**

Pursuant to the APA, a Court must set aside any agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In addition to requiring an agency decision to comply with substantive law, an agency must also provide "a reasoned basis for [its] action," *Rapp v. U.S. Dept. of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1515 (10th Cir. 1995); "explain the facts and policy concerns underlying its decisions and conclusions," *Kennecott Copper Corp. v. EPA*, 612 F.2d 1232, 1236 (10th Cir. 1979); and "provide a rational explanation for [departure from its own prior precedents]." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002).  In the present case, the NPS's decision to allow volunteer members of the public to kill elk in the RMNP violates all of these requirements.

## I.    NPS's Decision to Allow Public Volunteers to Kill Elk in the Park Contravenes the Organic Act and its Implementing Regulations.

Pursuant to the park system's Organic Act, the NPS must manage the national parks in such manner "as will leave them *unimpaired* for the enjoyment of future generations." 16 U.S.C. § 1 (emphasis added).  Further, "authorization of activities" in individual parks "shall not be exercised in derogation of the values and purposes for which these various areas have been established," except as otherwise provided by Congress in a park's enabling legislation. 16 U.S.C. § 1a-1. Thus, Congress intended that the NPS's conservation goals be dedicated to, and carried

5

out in accordance with, an ethic of nonimpairment, *see Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1453 (9th Cir. 1996) (the "overarching concern" of the Organic Act is "resource protection), and any public activity that removes, damages or destroys resources, including wildlife, in the national parks is generally prohibited under the Organic Act.

In keeping with the Organic Act's "nonimpairment directive," the NPS promulgated regulations *prohibiting all hunting and trapping* in national parks unless such activity is "specifically mandated" or "specifically authorized as a discretionary activity" under federal statutory law.[1] 36 C.F.R. § 2.2(a)-(b). Such regulations, promulgated pursuant to the agency's rulemaking authority, carry the force and effect of law. *Been v. O.K. Industries, Inc.*, 495 F.3d 1217, 1226 (10th Cir. 2007).

Federal courts have upheld the NPS's determination that the Organic Act expressly prohibits hunting and trapping activities in the national parks unless otherwise specifically authorized by the park's enabling statute. *See, e.g., Nat'l Rifle Ass'n of America v. Potter*, 628 F. Supp. 903, 910 (D.D.C. 1986) (rejecting the NRA's interpretation of the Organic Act as allowing hunting, and finding that the legislative history of the Act "lead[s] to the conclusion that Congress did not contemplate any so-called 'consumptive' uses of the new park system it was creating."); *Michigan United Conservation Club v. Lujan*, 949 F.2d 202, 207 (6th

---

[1] The enabling statutes of some national parks lands have specifically authorized hunting in those parks. *See, e.g.*, 16 U.S.C. § 460m-20 (New River Gorge National River), 16 U.S.C. § 460m-10 (Buffalo National River). Some enabling statutes are silent on the issue, and hunting is therefore disallowed. *See, e.g.*, 16 U.S.C. § 410zz (Saguaro National Park). The RMNP's Enabling Act specifically *prohibits* hunting. 16 U.S.C. § 198c; *see also* Section II, *infra*.

Cir. 1991) (upholding NPS's determination that trapping is permitted in national parks only where separately authorized by Congress "in light of the Organic Act and its amendments, that its primary management function with respect to wildlife is preservation unless Congress has declared otherwise").

In this case, the NPS rejected the use of public volunteers to assist in the lethal reduction of elk herds in the RMNP as unlawful in the Draft EIS, pursuant to the Organic Act and the agency's regulations. Draft EIS at 75-77 (AR 18625-27). *See also* "Legal Analysis of Hunting within Rocky Mountain National Park" (AR 8431) (stating that "[f]ederal law prohibits hunting within Rocky Mountain National Park . . . An act of Congress would be required to change or modify this prohibition . . . [The NPS] would then need to promulgate a new regulation to implement the congressional action"). Nevertheless, the NPS reversed its position – and without explanation – decided to provide such opportunities to the public in its Final EIS and decision document. Final EIS at 68, H-1 (AR 20935, 21498); ROD 4.

Moreover, the NPS's proposed use of members of the public to assist in the culling of the elk herd at the Park is practically identical to an alternative considered in October 2004, prior to production of the Draft EIS, which would have permitted "public marksmen" to assist NPS staff in lethal reduction activities. *See* Alternatives Workshop and Public Comments on the Draft Alternatives Report, Alternative E (AR 12414).[2]  Notably, this "public marksmen" option was eliminated

_____

[2] "Alternative E" in this preliminary report would have "relie[d] on gradual lethal reduction over time to regulate the elk population and distribution [to result in a target population of between 1,600 and 2,100 elk]" in the Park, stated that the lethal reduction elk in the park "would be carried out under controlled conditions by members of the public who qualify as marksmen and are accompanied

from consideration in the October 2004 report because NPS staff determined that, despite the controlled conditions of the hunt and the proficiency test requirement, this alternative constituted unlawful hunting within the Park.[3]  Indeed, the agency itself has admitted that its futile "stab at drawing a distinction between public marksmen and authorized agents" is illogical, acknowledging that "[i]t is difficult to follow the differences between a lottery hunt, special hunt using 'qualified marksmen,' and lethal reduction (culling) by NPS personnel or their authorized agents."  NPS Comments on Hunting Dismissal Language (AR 9037, 9036).  This admission led the agency to "remove reference to public marksmen in the dismissal language" of the Final EIS.  *Id.* (AR 9038).

In its Final EIS, the NPS feebly attempts to distinguish providing public volunteers with opportunities to shoot and kill elk in the Park from "hunting" by

---

by NPS staff or contracted guides." (AR 12414).  These "public marksmen" "would have to prove their ability to shoot at a defined 'marksmen' level of skill." *Id.*  In comparison, the alternative selected by the NPS in its Final EIS, Alternative 3, which incorporates public volunteers, states that this alternative "relies on the gradual lethal reduction (culling) of elk by NPS personnel and their authorized agents to achieve a high target population ranging between 1,600 and 2,100 total elk . . ." Final EIS at 68 (AR 20935).  The "authorized agents" carrying out this lethal reduction may be "qualified volunteers" who are "certified in firearms training, specially trained in wildlife culling, and [be] required to pass a proficiency test in order to qualify to participate in culling activities," would "work in teams under the supervision of a NPS team leader."  *Id.* at H-2, H-2 (AR 21499).

[3] *See* Draft Letter: Our Thoughts (AR 4359) ("The park and higher levels in the NPS recently decided that Alternative E, which used 'public marksmen' to accomplish elk reductions in the park, will be eliminated from further consideration.  *After much discussion at a nationwide level we were advised by our solicitor that the use of public marksmen in the context we presented would constitute hunting, which would require congressional authorization.*  Because such authorization is unlikely we determined that the alternative is unreasonable to meet the needs of the plan.") (emphasis added); Draft Dismissal Language for Hunting Scenarios (AR 6591-92) ("Gradual reductions of the herd would have been carried out *under strictly controlled conditions* by the public while accompanied by NPS staff or contracted guides . . . [T]hese individuals would have to show evidence of a weapons safety course completion and qualify at a marksman skill level as determined by the [NPS] . . . *Based on current [NPS] guidance, the use of public marksmen in the park would constitute hunting and this alternative was therefore dismissed* . . . hunting is not authorized in Rocky Mountain National Park's enabling legislation and the activity could be accomplished through more effective means using agency staff or contractors.") (emphasis added).

calling the activity "culling."  The NPS's stated distinctions between the two amount to nothing more than the following: "hunting" is recreational in purpose, requires a license, and involves fair chase and the take of meat; whereas "culling" is a tool to reduce animal populations, does not require a license, and is more structured and supervised.  Final EIS at 85 (AR 20952).  *See also* Final EIS at H-1 (AR 21498) (reiterating the same).  However, the decision provides no explanation for why "hunting" means only "recreational hunting" – a proposition that would greatly surprise anyone who has ever hunted for subsistence.  Moreover, none of these concocted distinctions changes the fact that the NPS has unlawfully authorized members of the public to destroy and remove Park resources.[4]

These distinctions are also illusory in light of the NPS's *own* regulatory definition of "hunting," which broadly includes any "taking or attempting to take wildlife, except trapping."  36 C.F.R. § 1.4.  The term "taking," in turn, means "to pursue, hunt, harass, harm, shoot, trap, net, capture, collect, kill, wound, or attempt to do any of the above."  *Id.*  Thus, attempting to shoot and kill wildlife – which is exactly the activity NPS seeks to authorize members of the public to do

---

[4] The NPS' singular focus on distinguishing a public "hunt," which it admits is unlawful, from public participation in a "cull," ignores the fact that the Organic Act does not merely prohibit public hunting, but all activities that remove, damage, or destroy park resources in derogation of the Act's mandate to preserve the value and integrity of those resources.  16 U.S.C. § 1a-1; *Potter*, 628 F.Supp. at 909-12.  *See also* 36 C.F.R. 1.4 (defining "hunting" as "taking or attempting to take wildlife . . .").  The agency fails to demonstrate how its use of public volunteers to "cull" the elk herd does not *also* deviate from the Organic Act's proscriptions on public activities that impair park resources.  This is also a violation of the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) (stating that "the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record).

under the management alternative newly created in its Final EIS – clearly constitutes "hunting" under the NPS's own regulations, and is therefore unlawful.[5]

Thus, the agency's preferred management alternative, described for the first time in the Final EIS, is the same illegal activity that had previously been rejected as unlawful on two prior occasions – just renamed in the hope that perhaps no one will notice. Simply labeling public volunteer hunters as "authorized agents" of the NPS does not transform the killing of elk by private sportsmen into a non-hunting event. Rather, it is nothing more than a misguided (and last minute) attempt to circumvent existing laws prohibiting consumptive uses of national parks by the public.

Indeed, it is clear from the Administrative Record that even the NPS is conflicted over whether there is any *meaningful difference*, in terms of the legal proscriptions involved, between public hunting and using volunteer hunters to kill elk in the park as "authorized agents" of the NPS. *See* NPS Comments on Hunting Dismissal Language (AR 9036) (acknowledging that "[i]t is difficult to follow the differences between a [ ] special hunt using 'qualified marksmen,' and lethal reduction (culling) by NPS personnel or their authorized agents"). Allowing members of the public to shoot and kill elk in the RMNP is a clear violation of the Organic Act and NPS's own regulations, and the NPS cannot avoid these

---

[5] Definitions of "hunting" found in other statutory schemes are also instructive. The Recreational Hunting Safety and Preservation Act, 16 U.S.C. § 5201, *et seq.*, which applies to all federal public lands, including those national parks where hunting has been authorized by Congress, defines "lawful hunt" as "the taking or harvesting (or attempted taking or harvesting) of wildlife and fish." *Id.* at § 5207(2). Likewise, the definition of "hunt" applicable to the Colorado state lands on which local hunters are permitted to kill elk includes any effort "to pursue, attract, stalk, lie in wait for, or attempt to shoot, wound, kill, trap, capture, collect, or take wildlife." Colo. Rev. Stat. § 33-1-102(25.5).

proscriptions on public hunting in the Park by calling volunteer hunters "agents" and declaring that the activity is a "cull." A court "skirt[s] its own responsibility of meaningful judicial review if, instead of demanding reasoned and principled explanations, it allowed [an agency] to rely on creative word games to justify departures from its policies." *Nat'l Black Media Coal. v. FCC*, 775 F.2d 342, 354 (D.C. Cir. 1985) (rejecting agency's attempt to avoid its own substantive rule against receiving post-term evidence by issuing an "abeyance" of a license term and declaring that receipt of evidence during this time did not violate the rule).

## II.    NPS's Decision to Allow Public Volunteers to Kill Elk in the Park Contravenes the RMNP Act.

In addition to violating the Organic Act and its associated regulations, allowing volunteer hunters from the general public to kill elk in the Park – instead of using agency resources and personnel to carry out NPS management policies – violates the plain language of the Park's enabling statute, the RMNP Act, 16 U.S.C. § 191 *et seq*.

In 1929, Congress amended the RMNP Act when Colorado approved ceding jurisdiction of all land within the Park to the federal government. *Id.* § 198. At the time, Congress chose to prohibit "*[a]ll hunting or the killing, wounding, or capturing at any time of any wild bird or animal.*" *Id.* § 198c. The only exceptions to this prohibition in the statute are for fishing and the incidental taking of "dangerous

animals when it is necessary to prevent them from destroying human lives or inflicting personal injury."[6]  *Id.*

Furthermore, NPS's decision that public volunteers "be afforded the opportunity to assist in culling operations," Final EIS at H-1 (AR 21498), does not comport with the protectionist nature of the Park's enabling statute.  Prior to 1983, the NPS divided park units into distinct management categories, such as "recreational areas," which permitted hunting, 36 C.F.R. § 2.32(b)(1) (1982), and "natural and historical areas," which prohibited hunting and other consumptive uses of these parks, *Id.* § 2.32(a)(1) (1982).  The RMNP Act established the RMNP as the latter, its language tracking the language of the "natural and historical area" regulations.  *Compare* 16 U.S.C. § 198c (described above) *with* 36 C.F.R. § 2.32(a)(1) (1982) (prohibiting "[t]he hunting, killing, wounding, frightening, [or] capturing . . . of any wildlife . . . except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury").  Thus, the RMNP Act not only prohibits "hunting" in the Park, it also establishes the Park as one of the truly natural areas of the park system, to be protected from *all* consumptive public uses.

Moreover, the NPS itself acknowledged that the use of volunteer hunters not only violated the Organic Act, but also the RMNP Enabling Act.  In addition to the

---

[6] The separate authority of the Secretary to provide for the destruction of animals within a park unit if such animals are "detrimental" to the integrity of the park is not prohibited by the Enabling Act if "conducted by the National Park Service, or its agents."  16 U.S.C. § 3.  However, it is clear from the Enabling Act's strict prohibition on public hunting that Congress did not contemplate Section 3 to authorize members of the public to enter the park and kill animals.  As discussed more fully above, such action is indistinguishable from hunting, and is in clear contravention of the Enabling Act's plain language.

Draft EIS dismissing this activity as unlawful, NPS staff also produced a memorandum entitled "Legal Analysis of Hunting within Rocky Mountain National Park" to state officials, which memorialized the Service's position that public hunting is not permitted. *See* Email from Vaughn Baker, Superintendant of Rocky Mountain National Park, to WASO, Regional Director, BRD Regarding Status of Plan and Hunting in the Park With Attached Analysis (AR at 8431). Therefore, the NPS's decision to now permit members of the public to enter the Park and kill elk – a complete reversal of its prior position – is clearly unlawful under the RMNP Act.

### III.   NPS's Decision to Allow Public Volunteers to Kill Elk in the Park Contravenes the Volunteers in the Parks Act.

The decision to authorize private hunters to kill park wildlife as "volunteers" also contravenes the plain language of the Volunteers in the Parks Act. 16 U.S.C. § 18g *et seq*. This statute permits the Secretary to use the service of members of the public in limited administrative capacities only – specifically, "as volunteers for or in aid of interpretive functions, or other visitor services or activities" in Park Service units. *Id.* § 18g.

Notably, the VIP Act does *not* authorize volunteer use in supplementing other functions of the NPS. In fact, the Senate Report accompanying the bill enacted into law only comprehends that it will allow the NPS to provide opportunities for "retired people" and the "young" to participate in activities such as providing "information services to visitors" and helping "in the interpretation of historical events." S. Rep. No. 1013, 91st Cong., 2d Sess. 2-3 (1970).

The VIP Act also states that "[i]n accepting such services of individuals or volunteers, the Secretary shall not permit the use of volunteers in hazardous duty," except where such individuals are skilled in particular activities.  16 U.S.C. § 18g. The Senate Report explains that: "[i]t should be clearly understood that no volunteers are to serve in any hazardous or dangerous occupation where the risks of injury are foreseeable" and explicitly states that the VIP Act was "not intended to provide any authority to utilize volunteers to operate potentially dangerous machinery."  S. Rep. No. 1013 at 2.  Certainly, therefore, allowing volunteers to fire loaded weapons in the national parks also constitutes a prohibited "hazardous" activity in violation of the language and intent of the VIP Act.

In keeping with the intent of the VIP Act, the NPS has promulgated rules setting out a detailed framework governing how parks are to implement the Act and specifically stating that volunteers *are not to perform duties involving firearms.  See* Department of Interior National Park Service Reference Manual No. 7: Volunteers in Park Service 14, Final Draft, *available at* http://www.nps.gov/ archive/volunteer/RM7_final_draft_6_05.pdf (last accessed Dec. 10, 2008) (stressing that volunteers "must not be assigned duties that would place them in a life-threatening situation, even as an observer.  Some examples of duties [volunteers] should not perform include . . . carrying modern firearms").

The Administrative Record supports this reading of the VIP Act.  *See* Hunting 3-Page Paper Revised Slightly (AR at 7443) ("consultations with the national VIP program office have indicated that the exception in the legislation

[ostensibly concerning use of "skilled" volunteers] *could not be used to allow volunteers to assist with animal reductions in parks*") (emphasis added). Accordingly, the NPS's decision to allow volunteers to use firearms to shoot animals in the RMNP is clearly an abuse of discretion directly contravening the NPS's official reference manual and policy interpreting the VIP Act.

## IV.   NPS's Decision to Allow Public Volunteers to Kill Elk in the Park Contravenes the National Environmental Policy Act.

### A.   NPS's Failure to Produce a Supplemental EIS Violates NEPA.

Under NEPA, a federal agency must prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Council on Environmental Quality ("CEQ") regulations require agencies to prepare a Supplemental EIS after the Draft EIS has been circulated if "[the] agency makes substantial changes in the proposed action that are relevant to environmental concerns."  40 C.F.R. § 1502.9(c)(1)(i).

In the present case, the NPS initially rejected an alternative that would have allowed public volunteers to kill elk in the park, and excluded this management option from the alternatives studied in detail in the Draft EIS.  Draft EIS at 75-77 (AR 18625-27).  This was the agency's position circulated to the public for comment, and upon which interested members of the public, including The HSUS and its members, relied in responding to the agency's proposal.  After the public comment period closed, the Park Service quietly shifted position and adopted the most controversial and illegal alternative possible – allowing private individuals to shoot and kill park wildlife for the first time in decades.

The NPS's last minute decision to open the park to public hunters was clearly a "substantial change" that was "relevant to environmental concerns," and thus required the preparation of a Supplemental EIS under the CEQ regulations. 40 C.F.R. § 1502.9(c)(1)(i). The agency's failure to do so clearly violates the requirements of NEPA.

Courts have consistently held that an agency must prepare a Supplemental EIS "if the changed plans and circumstances will affect the quality of the human environment 'in a significant manner or to a significant extent not already considered' by the federal agency." *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 204 (1st Cir. 1999) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374 (1989)). Courts in the Tenth Circuit review an agency's decision regarding the need to prepare a Supplemental EIS under the arbitrary and capricious standard. *Friends of Marolt Park v. U.S. Dept. of Transp.*, 382 F.3d 1088, 1096 (10th Cir. 2004).

In *Friends of Marolt Park*, the Tenth Circuit upheld the Department of Transportation's decision not to prepare a Supplemental EIS where the ROD selected an option not identified as the preferred option in the Final EIS because the agency had nevertheless previously considered the merits of that option in great detail. *Id.* at 1097. By contrast here, the NPS's decision here to use public volunteers to assist in the lethal reduction of the elk herd was specifically *eliminated from further consideration* in the Draft EIS, and the impacts of such an option were never analyzed in *any* detail, let alone "fully evaluated". Draft EIS at

75 (AR 18625); *Friends of Marolt Park*, 382 F.3d at 1097. *See also In re Operation of Missouri River Sys. Litig.*, 516 F.3d 688, 693 (8th Cir. 2008) (describing a substantial change that requires preparation of a Supplemental EIS as "one that is *not* 'qualitatively within the spectrum of alternatives that were discussed' in a prior EIS" (quoting *Dubois v. U.S. Dep't. of Agric.*, 102 F.3d 1273, 1292 (1st Cir. 1996) (emphasis in original)).

Moreover, the fact that the NPS rejected the use of public volunteers in the Draft EIS because the agency determined that the activity was *unlawful*, and stated that the activity "could be accomplished through more effective means using agency staff or contractors," clearly indicates that there are significant legal and practical implications that the agency failed to disclose and subject to public review under NEPA. *See* Draft Dismissal Language for Hunting Scenarios (AR 6592). Had the agency carefully analyzed these issues – including concerns for visitor safety, efficiency, and effects on stakeholder interests that are inimical to providing recreational opportunities to hunters – they may well have counseled a different course. Instead, the agency simply announced its abrupt change of course in its Final EIS and decision document, without any opportunity for review and participation by stakeholders other than those interested in opening national parks to hunting, as would be afforded by production of a Supplemental EIS.

The Administrative Record itself reflects the NPS's recognition of the necessity of preparing a Supplemental EIS under these circumstances. *See* Email to WASO Staff Re: Proposal To Do a SEIS On Using Authorized Agents (AR 8770)

(affirming "the need to do a supplement to the draft plan in order to fully evaluate the policy and socio-economic impacts regarding such an alternative," and stating that "[w]hile [the park's superintendant] understands why we need to do it, he does have concerns over how to fund it and how long it might take"). However, after a conference call between Park staff and the NPS headquarters in Washington, D.C., the Service chose *not* to prepare a Supplemental EIS – choosing instead "to use a FEIS for [RMNP] and a future plan with culling (next park opportunity in the NPS) to more fully vet the issues related to volunteers." ROMO Elk Plan/Conference Call with WASO (AR 8806).

While it certainly might be politically expedient for an agency to avoid any analysis of a controversial alternative involving private actors killing protected park wildlife, to do so contravenes NEPA, and is a clear example of arbitrary and capricious agency action.

B.   NPS's Decision to Allow Public Volunteers to Kill Elk in the Park, Which Was Expressly Rejected in the Draft EIS, Violates NEPA's Requirements for Public Participation.

A key component of the NEPA process is public participation, which "enables critical evaluation of an agency's actions by those outside the agency." *Catron County Bd. of Com'rs, N.M. v. U.S. Fish & Wildlife Service*, 75 F.3d 1429, 1434 (10th Cir. 1996). The CEQ, charged with the duty of implementing the mandates of NEPA, has promulgated regulations requiring agencies to engage the public in the EIS process. *See* 40 C.F.R. § 1503.1(a)(4) (requiring agency to "[r]equest comments from the public, affirmatively soliciting comments from those persons or

organizations who may be interested or affected); 40 C.F.R. § 1506.6(c)-(d) (requiring agency to hold or sponsor public hearings or meetings for issues involving substantial controversy or interest and to solicit information from the public).  As a result, the NEPA process "gives the public the assurance that the agency has indeed considered the environmental concerns in its decisionmaking process and, *perhaps more significantly, provides a springboard for public comment." Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)) (emphasis added).  *See also Dubois*, 102 F.3d at 1286-87 (stating that one of the "twin aims" of NEPA is to make information available to the public, which may then offer its insight to assist the agency's decisionmaking through the comment process).  Courts reviewing the adequacy of an EIS will "examine whether the EIS's "form, content and preparation foster both informed decisionmaking and *informed public participation." Friends of Marolt Park*, 382 F.3d at 1095 (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172 (10th Cir. 1999)) (emphasis added).

In this case, as discussed above, the Draft EIS did not discuss the possibility of participation by volunteers from the public in lethal reduction of the elk herd. Under the alternatives outlined in the Draft EIS, all lethal reduction would be accomplished by "NPS staff or contractors."  Draft EIS at i (AR 18509).  Indeed, alternatives "that would allow the public to be involved in management actions inside the park to directly reduce the elk population" were specifically *rejected* in the Draft EIS under a section entitled "Alternatives Eliminated from Further

Consideration." *Id.* at 75 (AR 18625).  The Draft EIS cited a number of reasons for rejecting the possibility of public participation in the reduction of the elk herd at RMNP, including inconsistency with NPS regulations and policy, inefficiency, safety concerns, and potential effects on the visitor experience.  *Id.* at 75-76 (AR 18625-26).

Nevertheless, it became clear upon publication of the Final EIS that the NPS had *entirely reversed* its position on the propriety of using volunteers from the general public to assist in lethal reduction activities.   Despite the explicit statements to the contrary in the Draft EIS, the preferred alternative described in the Final EIS provides for lethal reduction activities to be carried out by "NPS personnel and their authorized agents."   Final EIS at 68 (AR 20935).   The NPS's newly created definition of "authorized agents," in turn, includes "qualified volunteers" from the general public.  Final EIS at H-1 (AR 21498).

Notably, one public comment on the Draft EIS suggested framing the lethal reduction of the elk herd a "cull" and not a "hunt" to avoid statutory prohibitions on the latter, and argued that by failing to adopt this rationale, the NPS improperly rejected a "public hunt" alternative, and as such, the Draft EIS was a "flawed document."   Public Comment on the DEIS 2006 by the National Rifle Association (AR at 4341).   Non-hunter stakeholders, such as The HSUS, did not focus their comments on use of volunteer hunters, because the Draft EIS summarily rejected this idea as unlawful, inconsistent with long-standing policy, creating safety and efficiency concerns, and having potential negative effects on visitor experience. However, instead of engaging the public in a discussion of this management option,

the NPS simply adopted the NRA's proposal in the Final EIS.  This clearly contravenes NEPA, which requires agencies to "insure that environmental information is available to public officials and citizens *before* decisions are made." 40 C.F.R. § 1500.1(b) (emphasis added).

A key purpose of NEPA's public participation requirement is to "enable[ ] dissemination of relevant information to external audiences potentially affected by the agency's decision." *Catron County Bd. of Com'rs*, 75 F.3d at 1437.  Under CEQ regulations, alternatives must be presented in comparative form in order to "provid[e] a clear basis for choice among options by the decisionmakers and the public." 40 C.F.R. § 1502.14.  "Because of the importance of NEPA's procedural and informational aspects, if the agency fails to properly circulate the required issues for review by interested parties, then the EIS is insufficient even if the agency's actual decision was informed and well-reasoned." *Dubois*, 102 F.3d at 1287.  In the present case, informed public participation was thwarted when the NPS entirely reversed course between the Draft EIS and the Final EIS in deciding to allow the public to be directly involved in the lethal reduction of the elk herd inside the park after summarily eliminating this option from consideration.  Individuals or organizations that could have offered valuable input on the legitimacy and propriety of this course of action were not permitted to do when the DEIS made clear that such an option was illegal and not open to discussion.

**V.    NPS's Failure to Explain the Agency's Dramatic Departure from Past Agency Precedent Prohibiting the Use of Public Volunteers is Arbitrary and Capricious.**

Finally, in addition to being contrary to law, the NPS's decision to allow members of the public to participate in lethal reduction activities in the RMNP violates the APA because the Service failed to provide a rational explanation for why it made this decision – which represents a significant departure from longstanding agency policy – particularly since the agency claimed it had substantial concerns with this option in the Draft EIS.[7]  As noted above, "[i]t is fundamental that an agency explain the facts and policy concerns underlying its decisions and conclusions." *Kennecot Copper Corp.*, 612 F.2d at 1236.

In the Draft EIS, the NPS summarily rejected the option of incorporating members of the public into lethal elk reduction activities, not only because the agency determined such activities were unlawful, but also due to inefficiency, safety concerns, and potential negative effects on visitor experience.  Draft EIS at 75-76 (AR 18625-26).  Moreover, in its Draft Dismissal Language for Hunting Scenarios,

---

[7] Nor may any reasonable explanation for the NPS's decision to include public volunteers in lethal reduction activities within the park be found in the Administrative Record in this case.  Indeed, if anything, the Record shows that there *is no* reasonable explanation for this action.  *See, e.g.*, Update to the Public on the Alternatives That Will Be Analyzed in the EIS (AR 3481) (stating that "the moderate level of elk reduction over time could be accomplished through more effective means using agency staff or contractors [as opposed to members of the public who qualified as marksmen]); Hunting in the National Park System (AR 4087) (stating that "[t]he cost of special/managed hunts in dollars is similar to that of sharpshooting and sharpshooting is more effective in meeting management goals and reducing indirect impacts.  Further, effectiveness of public hunters may decline if a trend towards decreased hunter participation continues); Talking Points (AR 8326) (stating that "using staff is more effective in meeting management goals of minimizing impacts to the visitor experience . . . There are 90 years of expectations that recreational activities exist in RMNP besides hunting); A Fact Sheet From RMNP Re: Public Hunting, Cost, and Culling (AR 8607) (stressing that "[w]hile the NPS has broad legal authority to use volunteers in a variety of capacities in national parks (including culling), we have not contemplated using volunteers in this manner in the past due to the high risk nature of this activity . . . Volunteers require supervision and coordination by park staff, so while they are not paid a salary, their services are not free . . . .").

the Service stated that the desired gradual reductions of the elk herd "*could be accomplished through more effective means using agency staff or contractors*," when compared to the option of allowing reductions "by the public while accompanied by NPS staff or contracted guides." (AR 6592, 6591) (emphasis added).  In abruptly reversing its position in the Final EIS, the NPS failed to discuss any factual or policy considerations indicating that the agency grappled with these significant concerns of safety, efficiency, and negative effects on park visitors, and failed to establish the benefits of incorporating public volunteers in lethal reduction activities that outweigh these concerns and thus counsel adoption of the Service's proposed management plan.

Furthermore, the NPS also initially rejected the use of public volunteers to kill elk in the park because it was inconsistent with the NPS's own regulations and long-standing management policies.   Draft EIS at 75-76 (AR 18625-26).   The agency's failure to provide *any* rationale for this significant departure from its prior precedent[8] is arbitrary and capricious under the APA. Courts have consistently found agency action to be arbitrary and capricious when the agency fails to explain departure from its own precedent.

It is well-settled law that "where [an agency] pursues a course contrary to his prior practice, [it] is obliged to explain [its] actions more thoroughly than if [it] were

---

[8] *See, e.g.*, A Fact Sheet From RMNP Re: Public Hunting, Cost, and Culling (AR 8607-08) (stating that "we have not contemplated using volunteers in this manner in the past due to the high risk nature of this activity . . . This issue has implications for the entire [NPS] . . . ."); Safari Club International, Rocky Mountain National Park To Allow "Qualified Volunteers" to Help Cull Herds," *at* http://scifirstforhunters.org/articles/index.cfm?action=view&article_ID=3208 (last accessed Dec. 10, 2008) (stating that "[t]his major step in wildlife management marks the first time that the NPS has given its blessing to the use of qualified volunteers as 'authorized agents' for culling purposes in a National Park").

following a consistent pattern." *Doyle v. Brock*, 821 F.2d 778, 786 (D.C. Cir. 1987). *See also Hoyl v. Babbitt*, 129 F.3d 1377, 1384 (10th Cir. 1997) (declaring that "an agency acts arbitrarily and capriciously when its actions depart from well-established agency precedent without a reasoned explanation"); *Utahns for Better Transp.* 305 F.3d at 1165 ("[a]gencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure); *City of Fort Morgan v. FERC*, 181 F.3d 1155, 1163 n.13 (10th Cir. 1999) (agency's failure to explain a departure from precedent is arbitrary and capricious). The NPS's failure to provide any rationale for its departure from its prior decisions and policies precluding members of the public from lethally removing animals from national parks is therefore arbitrary and capricious in violation of the APA

## Conclusion

For the foregoing reasons, this Court should grant Plaintiff's petition for review of agency action and set aside the agency decision authorizing the use of volunteer hunters in the Rocky Mountain National Park.

Respectfully submitted,

Dated: December 10, 2008

/s/James W. Hubbell
James W. Hubbell
Kelly Garnsey Hubbell + Lass LLC
1441 Eighteenth Street, Suite 300
Denver, Colorado 80202
Ph: 303-296-9412
Fax: 303-293-8705
E-Mail: jhubbell@kghllaw.com

*Attorney for Interested Party/Amicus,*
*The Humane Society of the United States*