IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Honorable Marcia S. Krieger**

Civil Action No. 08-cv-00608-MSK

WILDEARTH GUARDIANS,

       Plaintiff,

v.

NATIONAL PARK SERVICE,

       Defendant.

**OPINION AND ORDER AFFIRMING AGENCY ACTION**

THIS MATTER comes before the Court for resolution of the merits of this administrative agency appeal. The Court has reviewed the record including the parties' briefs **(# 73, 85, 90)**, the response brief of intervenors Safari Club International Foundation and Safari Club International (collectively, "Safari Club") **(# 86)**, the *amicus curiae* brief of The Humane Society of the United States ("HSUS") **(# 72)**, WildEarth Guardian's ("WildEarth") submission of supplemental authority **(#93)**, and the National Park Service's ("Park Service") and Safari Club's responses to the same **(# 94, 102)**.

Exercising jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331, the Court **AFFIRMS** the decision of the National Park Service.

**FACTS**

For many years, Park Service officials responsible for the maintenance of Rocky Mountain National Park ("RMNP") have attempted to deal with overpopulation of elk in the

park. There are no sizable populations of natural predators (most notably, gray wolves) in the area, and human predation, in the form of hunting, is statutorily banned in the park. As a result, elk populations grow without restriction, which can result in a variety of adverse environmental consequences, including damage to vegetation and disease risk. To avoid these outcomes, beginning in 2003, the Park Service began exploring options for controlling the size of the elk population in the park.

In 2006, after a lengthy administrative proceeding, the Park Service prepared the Rocky Mountain National Park Elk and Vegetation Management Plan that detailed five alternatives to address the size of the elk population: (1) no action; (2) immediate lethal removal (*i.e.* using sharpshooters to kill selected female elk); (3) gradual lethal removal together with the use of fencing and distribution techniques; (4) distribution of fertility control agents combined with gradual lethal removal; and (5) lethal removal coupled with the release of predatory, sterile gray wolves.

The Park Service elected the third alternative – gradual lethal removal combined with fencing and dispersal techniques. This plan called for "[Park Service] Staff and authorized agents" to "cull" selected elk.[1] Under the plan, culling would be conducted by "authorized agents". Authorized agents could include members of the public who are certified in firearms training, who are specially trained in wildlife culling, and who have passed a firearms proficiency test. Culling operations would be supervised by the Park Service and authorized agents would act only "under the direct supervision of [Park Service] personnel."

---

[1] The Park Service distinguished such "culling" from traditional hunting by noting that culling would be supervised by the Park Service controlled circumstances.

After the Park Service announced its selection of this the elk management plan, WildEarth Guardians filed this action in which it contests the decision made by the Park Service. WildEarth challenges the decision under the Administrative Procedures Act ("APA"), 5 U.S.C. § 501 *et seq.* on two grounds: (i) that the Park Service violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347 ("NEPA"), by prematurely eliminating an additional alternative – the introduction of a natural (*i.e.* fertile) gray wolf population – from consideration during the drafting of an environmental impact statement ("EIS"); and (ii) that the proposed plan violates the Park Service Organic Act, 16 U.S.C. §§ 1-4, and the Rocky Mountain National Park Act, 16 U.S.C. §§ 191-195a, because culling by public volunteers violates those Acts' prohibition on "hunting" in the national park.

In addition to the briefs filed by the parties, The Safari Club, an organization of sportsmen and recreational hunters, intervened and submitted a brief in support of the Park Service. HSUS filed an *amicus curiae* brief in support of WildEarth's challenge.[2] After the issues were fully briefed, WildEarth submitted a post-decision statement of U.S. Secretary of Interior Ken Salazar. as "supplemental authority", the submission of which the Park Service and Safari Club challenge.

---

[2] In its *amicus* brief, HSUS raises two arguments not brought in WildEarth's petition, namely that (1) the plan violates the Volunteers in the Parks Act, 16 U.S.C. § 18g *et seq.*, and (2) an alternative that uses public volunteers to cull elk violates NEPA. The Court will not reach these arguments. Although the Court has discretion to consider arguments raised only in an *amicus curiae* brief, that discretion is only exercised in exceptional circumstances, and such circumstances are not presented here. *See Tyler v. City of Manhattan*, 118 F.3d 1400, 1403-04 (10th Cir. 1997).

## ANALYSIS

### A. Standard of Review

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Court is required to review the entire record of proceedings before the agency and to set aside the agency's action if it finds that action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).

Under NEPA, an agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment. *Forest Guardians v. U.S. Fish and Wildlife Service*, 611 F.3d 692, 711 (10th Cir. 2010). In reviewing factual determinations, the Court's task is only to determine whether the agency took a "hard look" at the information relevant to that decision. *Id*. A "hard look" requires examination of the relevant data and articulation of a rational connection between the facts found and the decision made. *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 713 (10th Cir. 2009). When the issues require the agency to interpret a statute it applies, the question for the court is whether the agency's construction of the statute is unreasonable or impermissible. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842-43, 845 (1984); *Forest Guardians*, 611 F.3d at 704.

An agency's decision is presumed valid, therefore the party challenging the agency's

action bears the burden of proof.  *Citizen's Committee to Save our Canyons v. Krueger,* 513 F.3d 1169, 1176 (10th Cir. 2008).

### B.  NEPA Challenge

WildEarth first claims that the Park Service violated NEPA procedures when it decided not to include the introduction of a self-sustaining wolves as a reasonable alternative for managing RMNP's elk population in the Environmental Impact Statement (EIS).

#### 1.  Overview of NEPA

The twin purposes of NEPA is to require agencies to consider environmentally significant aspects of a proposed action, and, in doing so, to inform the public that the agency's decision making process includes environmental concerns.  *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 97 (1983); *Forest Guardians*, 611 F.3d at 711. "NEPA prescribes the necessary process, but does not mandate particular results.  Accordingly, agencies are not required to elevate environmental concerns over other valid concerns."  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163-64 (10th Cir. 2002), *modified on other grounds*, 319 F.3d 1207 (10th Cir. 2003) (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350-51 (1989) and *Baltimore Gas*, 462 U.S. at 97).  As long as the record demonstrates that the agency followed the NEPA procedures, the court will not question the wisdom of that decision.  *Id*. at 1163.

NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) prior to taking major federal action. 42 U.S.C. §§ 4332(C).  The EIS must "rigorously explore and objectively evaluate all reasonable alternatives" to a proposed action in comparative form, so as to provide a "clear basis for choice among the options."  40 C.F.R. § 1502.14.  Reasonable

alternatives are those which are "bounded by some notion of feasibility," *Utahns for Better Transp.*, 305 F.3d at 1172, and, thus, need not include alternatives which are remote, speculative, impractical, or ineffective. *Custer County Action Assoc. v. Garvey*, 256 F.3d 1024, 1039-40 (10th Cir. 2001) (citation omitted). The EIS also must briefly discuss the reasons for eliminating any alternative from detailed study. 40 C.F.R. § 1502.14(a). The Court applies "a rule of reason standard (essentially an abuse of discretion standard)" in deciding whether claimed deficiencies in an EIS are significant enough to defeat the goals of NEPA. *Utahns for Better Transp*, 305 F.3d at 1163.

### 2. Was A Natural, Self-Sustaining Wolf Population a Reasonable Alternative for Managing the Elk Population in RMNP?

As required by NEPA, the Park Service prepared an EIS. In it, the Park Service explained its decision not to consider a natural wolf population as an alternative as follows:

> The National Park Service held a formal workshop in March 2005 with a panel of experts from multiple agencies to discuss the use of wolves as a means of managing the elk population. Based on this meeting and numerous other meetings with technical experts, the National Park Service and the experts agreed that at this time, <u>without support from neighboring federal, state, and local agencies, the reintroduction of a self-sustaining wolf population would not be feasible</u>. In addition, the National Park Service considered the concerns by neighbors of perceived and real threats; the degree of expected conflict with livestock and domestic pets; the limited suitable habitat available for wolves outside the park; and the intensive management that would likely be required to respond to external issues. As a result of these deliberations, this alternative was eliminated from further consideration.

(Final EIS, Rec. at 21536 (emphasis added); *see also* Rec. 29057 ("Without support of agencies within the region to protect wolves from depredation outside the park, there would be no assurance that a wolf population would survive").

WildEarth contends that the reasoning of the Park Service on this point runs counter to the evidence before the agency. Thus, the task of the Court is to determine whether the Park Service examined the relevant data and articulated a rational connection between that data and its determination that a self-sustaining wolf population was not a feasible alternative. *See Forest Guardians*, 611 F.3d at 711. As discussed below, the Court finds that the Park Service took the required "hard look" at this alternative before deciding not to include it in the EIS.[3]

In approximately March 2004, the Park Service's research showed that the success of a natural wolf population in managing elk populations in RMNP, without the cooperation of other agencies, was a subject of debate. The Park Service convened a three-day workshop to gather information in developing and assessing a self-sustaining and intensely managed wolf alternative. The workshop included presentations by 12 academic and agency experts on various topics, including the experiences of wolf reintroduction in Yellowstone National Park and Canada's Banff National Park, modeling of wolf and elk interactions in RMNP, the realities and human dimension of wolf reintroductions, and the impact of wolves on livestock. Based on the information presented at the workshop, the experts concluded that reliance upon a self regulated population of wolves was experimental and might not be feasible. The experts agreed that the relatively small size of RMNP combined with an inability to control over where the wolves

---

[3] WildEarth also contends the Park Service improperly predetermined that it would select the lethal reduction alternative, and thus did not consider in good faith the possibility of a self-sustaining wolf population as an alternative. "[P]redetermination occurs only when an agency irreversibly and irretrievably commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis." *Forest Guardians*, 611 F.3d at 714 (emphasis in original). WildEarth has not pointed the Court to any evidence demonstrating that the Park Service "irreversibly and irretrievably" committed itself to eliminating as an alternative a natural wolf population prior to conducting its environmental analysis. As such, the Court rejects WildEarth's argument.

would go would result in an increased likelihood of interactions between wolves and humans as well as concerns by neighbors about the safety of livestock and pets. This would require a diversion of resources to manage such social impacts. These problems together with absence of support from other agencies resulted in a consensus among the experts that wolf reintroduction would be successful only if it was intensely monitored and managed. The information presented at the workshop supports this conclusion.

WildEarth points to evidence in the record that supports a contrary conclusion. However, simply because there is some evidence supporting another perspective does not make the alternative more feasible the decision of the Park Service arbitrary and capricious. NEPA sets out a process, but does not mandate particular results. *Utahns for Better Transp.*, 305 F.3d at 1164. NEPA simply requires the Park Service to evaluate the relevant data (which may be conflicting) and to rationally connect its decision to the data. The Park Service did just that.

Accordingly, the Court finds that the Park Service's decision not to include use of a natural wolf population as an alternative in the EIS was not arbitrary, capricious or otherwise not in conflict with the law .[4]

---

[4] Because infeasibility is linked, in part, to the lack of support from the surrounding jurisdictions, the Court need not reach Safari Club's additional argument that application of the Endangered Species Act, 16 U.S.C. § 1531 *et seq*, also made the alternative unreasonable.

### D. Challenge Based on the Organic Act and the RMNP Act

#### 1. Submission of Extra-Record Evidence

Because this action does not violate the APA, the Court turns to the second issue – whether the preferred alternative contravenes either the Organic Act or the RMNP Act. The Court begins by determining whether the post-decision statement of the Secretary of the Interior should be considered.

The Secretary made an oral statement on June 5, 2009, during colloquy with the Senate Interior Appropriations Committee. The Secretary was asked by Senator Dorgan about elk overpopulation problems in Teddy Roosevelt National Park in North Dakota. Senator Dorgan noted that "the [Park Service] talked about maybe hiring federal sharpshooters and then using helicopters to transport out the carcasses," something Senator Dorgan considered "completely devoid of common sense." He noted that "in the Grand Tetons," the Park Service "go[es] ahead and qualif[ies] certain hunters . . . to come in as agents and thin the herd . . . without any federal cost at all." Senator Dorgan stated that he wanted "to see if I could get the same position in" Teddy Roosevelt National Park. Senator Dorgan noted concern that the Park Service had recently changed or was intending to change this policy, noting that "[n]ow they're thinking that maybe they will allow some hunters but not allow any hunter to take the meat." He inquired "can you help us get to a conclusion that just allows the federal government to get the elk herd thinned without spending fed money and allowing qualified hunters to come in and take the meat home . . .?"

The Secretary responded that "the elk issue is one I think which calls out for common sense solutions and that is what we will push." He explained that "at Rocky Mountain National

9

Park, we came up with a common sense solution <u>that involved hunting</u>, and that uses the reality which we all know . . . that hunting is in fact a wildlife management tool . . . ." (Emphasis added by WildEarth). WildEarth contends that the Secretary's statement demonstrates that there is no distinction between culling and hunting.

The Court declines to consider this statement as supplemental authority for several reasons. First, it is not "supplemental authority" as to any statement of law. WildEarth offers the statement as <u>evidence</u>, not legal authority. This statement does not assist the Court in ascertaining or interpreting the applicable law; instead WildEarth attempts to offer it as a factual admission by the Secretary that "culling" is identical to "hunting." Fed. R. App. P. 28(j) does not permit the submission of new evidence under the guise of "supplemental authority." *See Utah v. U.S. Department of Interior*, 535 F.3d 1184, 1195-96 n.7 (10th Cir. 2008).

Second, "[j]udicial review of agency action is normally restricted to the administrative record." *Citizens for Alternatives to Radioactive Dumping v. U.S. Department of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007). Extra-record evidence will be considered only in "extremely limited circumstances" that include (1) the agency's failure to consider relevant factors or the consideration of factors outside the record, (2) a strong showing of bad faith or improper behavior, or (3) specific circumstances involving scientific and technical evidence. *Id*. WildEarth does not argue, and the Court does not find, that such circumstances are present in this case.

Third, even if the Court were to consider the statement for its evidentiary character, it would reject it as irrelevant to the dispute here. The Secretary's statement does not purport to address the factual question presented here – whether there is a difference between "hunting"

and "culling" – nor does it reflect the Secretary taking a position on the legal question presented in this case – whether the "culling" process violates statutory prohibition against "hunting" in RMNP.   It appears from the context of the interchange that the Secretary used the term "hunting" (and its derivatives) in his answer because that was the term Senator Dorgan used in his question, and because the emphasis of both the question and the answer was upon "common sense" terminology, rather than legal terms of art.  Absent some evidence that the Secretary's statement was specifically intended to render either a factual or legal opinion on the issues presented in this case, the Court would ascribe no particular significance to the Secretary's reference to the RMNP program as "hunting."

For these reasons, the Court declines to consider the statement in its review.

### 2. Overview of the Organic Act and the RMNP Act

The Organic Act mandates that the Park Service promote and regulate park use:

> by such means and measures as conform to [its] fundamental
> purpose . . . to conserve the scenery and the natural and historic
> objects and the wild life therein and to provide for the enjoyment
> of the same in such manner and by such means as will leave them
> unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.  The Organic Act prohibits the authorization of activities in derogation of  these values and purposes. 16 U.S.C. § 1a-1.  Courts who have analyzed the relevant legislative history have concluded that Congress did not regard the national parks to be compatible with consumptive use, but rather with natural preservation and user enjoyment.  *National Rifle Assoc. of America v. Potter*, 628 F.Supp. 903, 910-12 (D.D.C. 1986); *accord Michigan United Conservation Clubs v. Lujan*, 949 F.2d 202, 207 (6th Cir. 1991).  Consequently, the Organic Act has been interpreted as prohibiting hunting in the national parks, absent specific Congressional

authority providing otherwise. *National Rifle Assoc. of America v. Potter*, 628 F.Supp. 903, 910-12 (D.D.C. 1986). However, consistent with its conservation mandate, the Organic Act also provides that the Secretary of the Interior may "provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any said parks, monuments, or reservations." 16 U.S.C § 3.

Pursuant to the Organic Act, each national park must be administered in accordance with its enabling legislation, which for RNNP is the Rocky Mountain National Park Enabling Legislation ("RMNP Act"). *See* 16 U.S.C. §§ 1c(b) and 191 *et seq*. The RMNP Act provides for:

> the management and care of the park and for the protection of the property therein, especially for the preservation from injury or spoliation of all timber, natural curiosities, or wonderful objects within said park, and for the protection of the animals and birds in the park from capture or destruction, and to prevent their being frightened or driven from the park.

16 U.S.C. § 198c. Conforming to these principles, the RMNP Act expressly prohibits "[a]ll hunting or the killing, wounding, or capturing at any time of any wild bird or animal" in RMNP. 16 U.S.C. § 198c. However, it specifically incorporates the Organic Act's provision for the discretionary destruction of animals that are detrimental to the park by the Park Service. 16 U.S.C. §§ 197.

### 3. Does Culling by "Authorized Agents" Violate the Acts' Prohibition on Hunting?

The plan incorporates the culling of elk by "[Park Service] personnel and their authorized agents" and explains that "authorized agents" could include "qualified volunteers" with specified training and experience. WildEarth does not dispute that the Park Service has authority under 16

U.S.C. § 3 to provide for the culling of animals that are detrimental to the use of the park, or that the Park Service can authorize agents to help perform the cull. Rather, WildEarth's challenge is directed solely to the Park Service's interpretation of the statutes to permit the use of public volunteers as the authorized agents, contending the use of public volunteers transforms permitted "culling" into prohibited "hunting."

Congress has not expressly addressed the meaning of "hunting" nor whether public volunteers can be used to provide for the destruction of detrimental animals. Instead it has vested discretion in the Park Service to carry out its obligations to administer RMNP according to the Organic and RMNP Acts. Distinguishing between "hunting" and "culling" falls within that discretion, and the Court defers to the Park Service's definition of "hunting" so long as the Park Service's interpretation does not conflict with the plain meaning of the Acts. *See Forest Guardians*, 611 F.3d at 704, 706. In this regard, the RMNP Act provides that "[a]ll hunting or the killing" is prohibited, yet it also permits "the destruction of such animals . . . as may be detrimental to the use of any said parks." 16 U.S.C. §§ 198c, 197 (incorporating 16 U.S.C. § 3 of the Organic Act.) The latter is necessarily an exception to the former, and thus, the Court must determine whether the Park Service's interpretation gives vitality to the latter without nullifying the former.

The Park Service provided its answer in the EIS. It distinguishes the concepts of "hunting" and "culling" in three ways - the purpose for destroying the animals, and the manner in which the destruction occurs and the disposition of the animal that is killed. Culling occurs when animals are destroyed primarily for conservation purposes, while hunting occurs when the destruction is primarily for recreational purposes. Culling is conducted under controlled

circumstances under the direction and supervision of Park Service personnel, while hunting is performed at the hunter's discretion (subject to the terms of any applicable license conditions and regulations) and with elements of "fair chase" present.[5]  Culling does not allow the person who killed the animal to keep the meat, hunting does.  Put simply, culling serves the public purpose, while hunting serves both public and private purposes.

These distinctions comport with the plain meaning of the statutory exception, which is expressly intended to permit the Park Service to protect the park from detrimental animals.  It is also faithful to the purposes underlying the Organic Act's hunting prohibition, namely to protect the park and its wildlife through conservation measures and the prevention of consumptive use. *See Michigan United Conservation Clubs v. Lujan*, 949 F.2d 202, 207 (6th Cir. 1991) (adopting findings of *National Rifle Assoc.*, 628 F.Supp. at 909-910).

Other than pointing to the broad prohibition against "hunting" or "killing," which it concedes has an exception, WildEarth offers little to show why the Park Service's interpretation is unreasonable.  WildEarth has not directed the Court to anything in either the language of the Acts or their legislative history that suggests the Park Service's line-drawing between the prohibition and its exception is unreasonable or impermissible.  Accordingly, the Court defers to the Park Service's construction and finds that the use of public volunteers to cull elk under the conditions of the plan does not violate the Organic Act or the RMNP Act.

---

[5] WildEarth contends the Park Service's interpretation of the statutes is reflected in various communications in the administrative record which suggest Park Service personnel believed the use of public volunteers violated the hunting prohibition.  WildEarth has provided no references to support this argument.  The Court, therefore, rejects this contention and looks instead to the interpretation set forth in the formally issued EIS.

## CONCLUSION

Having reviewed the administrative record and the arguments of the parties and *amicus curiae*, the Court finds that the Park Service complied with NEPA when eliminating a natural wolf population as a reasonable alternative from the EIS and that the alternative that incorporates the culling of elk by public volunteers does not contravene either the Organic Act or the RMNP Act. The Park Service's decision to use authorized agents to cull elk in RMNP was not arbitrary, capricious, or otherwise contrary to law. Accordingly, the Park Service's decision is **AFFIRMED**. The Clerk of the Court shall enter judgment in favor of the Defendant and close this case.

Dated this 23rd day of March, 2011

BY THE COURT:

*/s/ Marcia S. Krieger*

Marcia S. Krieger
United States District Judge